Toy Terrell Smith /# D-92679
Name and Prisoner/Booking Number

CSP- SAC IV ( New Folsom State Prison)
Place of Confinement

P.O. Box 290066
Mailing Address

Represa, California 95671
City, State, Zip Code

In Pro Per.

(Failure to notify the Court of your change of address may result in dismissal of this action.)

RECEIVED

DEC 27 2016

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
DEPUTY CLERK

FILED

DEC 27 2016

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

Toy Terrell Smith
(Full Name of Plaintiff)          Plaintiff,

v.

(1) R.M. Hutchinson
(Full Name of Defendant)

(2) " and others "

(3)

(4)

Defendant(s).

☐ Check if there are additional Defendants and attach page 1-A listing them.

)
)
)
)
)
)  CASE NO. 1:16-CV-01924 EPG (PC)
)       (To be supplied by the Clerk)
)
)
)
)
)
)  **CIVIL RIGHTS COMPLAINT**
)        **BY A PRISONER**
)  " JURY TRIAL DEMANDED "
)
)  ☒ Original Complaint
)  ☐ First Amended Complaint
)  ☐ Second Amended Complaint

## A.  JURISDICTION

1.  This Court has jurisdiction over this action pursuant to:

☒ 28 U.S.C. § 1343(a); 42 U.S.C. § 1983

☐ 28 U.S.C. § 1331; Bivens v. Six Unknown Federal Narcotics Agents, 403 U.S. 388 (1971).

☐ Other: _____.

2.  Institution/city where violation occurred: Please See; Extra Page, "1-A"(attached)

1  Continued from Page #1. (Face Page)
2  Named Defendants
3
4  2.) J. Lewis
5  3.) J. Torres
6  4.) M. Hoggard
7  5.) J. Gallagher
8  6.) J. Acebedo
9
10
11
12  Continued from Page #1. (A. JURISDICTION /question #2.)
13
14  Institution /City where violation occurred;
15  Answer.) The violations occurred at Kern Valley State
16  Prison and Corcoran State Prison. The claims arise out
17  of the same transactions and occurrences. Also, the
18  questions of law and facts common to all defendants
19  do arise in the action as described in Rule 20(a)(2)
20  of Federal Rules of Civil Procedure.
21
22
23
24
25
26
27
28

Page "1-A".

## B. DEFENDANTS

1. Name of first Defendant: R. M. Hutchinson. The first Defendant is employed as:
Chief Executive Officer, Mental Health Services. Kern Valley State Prison.
(Position and Title)                    (Institution)

2. Name of second Defendant: J. Lewis. The second Defendant is employed as:
Deputy Director at Calif Correctional Health Care Services.
(Position and Title)                    (Institution)

3. Name of third Defendant: J. Torres. The third Defendant is employed as:
Correctional Counselor (one) at Kern Valley State Prison.
(Position and Title)                    (Institution)

4. Name of fourth Defendant: M. Hoggard. The fourth Defendant is employed as:
Correctional Counselor (Two) at Kern Valley State Prison.
(Position and Title)                    (Institution)

**If you name more than four Defendants, answer the questions listed above for each additional Defendant on a separate page.**

## C. PREVIOUS LAWSUITS

*Please See: Page "2-A". (Attatched)*

1. Have you filed any other lawsuits while you were a prisoner?  ☒ Yes    ☐ No

2. If yes, how many lawsuits have you filed? 3 . Describe the previous lawsuits:

   a. First prior lawsuit:
      1. Parties: Toy Terrell Smith v. Jeanne Woodford, et al.
      2. Court and case number: U.S. District Court (N.D. California) – C 05 - 3373.
      3. Result: (Was the case dismissed? Was it appealed? Is it still pending?)
      Denied on Appeal

   b. Second prior lawsuit:
      1. Parties: Toy Terrell Smith v. K. Cruse, et al.
      2. Court and case number: California Superior Court, Del Norte County CVUJ14 - 1329.
      3. Result: (Was the case dismissed? Was it appealed? Is it still pending?)
      Denied due to failure to meet time Constraints

   c. Third prior lawsuit:
      1. Parties: Toy Terrell Smith v. K. Cruse, et al.
      2. Court and case number: U.S. District Court (N.D. California) CV-10-03684 .
      3. Result: (Was the case dismissed? Was it appealed? Is it still pending?)
      Denied in part, reversed in part on appeal, remanded back to U.S.D.C.

**If you filed more than three lawsuits, answer the questions listed above for each additional lawsuit on a separate page.**

(Continued from Page #2.) – B. DEFENDANTS

5.) Name of fifth defendant: J. Gallagher.
The fifth defendant is employed as a Departmental Captain at
Corcoran State Prison, Administrative Segregation Unit.

6.) Name of sixth defendant: J. Acebedo.
The sixth defendant is employed as a Departmental Captain
at Kern Valley State Prison.

Page "2-A."

## D. CAUSE OF ACTION

### CLAIM I

1. State the constitutional or other federal civil right that was violated: Eighth Amendment to the United States Constitution/Cruel and Unusual Punishment.

2. **Claim I.** Identify the issue involved. Check **only one**. State additional issues in separate claims.

   ☐ Basic necessities  ☐ Mail  ☐ Access to the court  ☐ Medical care
   ☐ Disciplinary proceedings  ☐ Property  ☐ Exercise of religion  ☐ Retaliation
   ☐ Excessive force by an officer  ☐ Threat to safety  ☒ Other: Mental Health Care

3. **Supporting Facts.** State as briefly as possible the FACTS supporting Claim I. Describe exactly what **each Defendant** did or did not do that violated your rights. State the facts clearly in your own words without citing legal authority or arguments.

   ① On October 2, 2013 the plaintiff filed a 602 Health Care Appeal (602 HCA) after being placed in the administrative segregation unit (ASU) at California State Prison - Sacramento (a.k.a New Folsom State Prison).

   ② The plaintiff was placed in New Folsom (ASU) after suffering a stabbing incident in the general population in which he was stabbed in the left side shoulder - neck area on 9/27/13 by someone he did not know.

   ③ In addition to filing a (602 HCA) the plaintiff spoke to his mental health clinician (i.e., Dr. Lacy) on 10/2/13 for a routine one on one interview session.

   ④ In his (602 HCA) and during the personal one on one session with his mental health clinician the plaintiff explained that he was suffering great mental stress, pains, could not think clearly, focus, or reason straight and that he was suffering a mental strain like he never experienced before.

   ⑤ The plaintiff explained and reasoned to mental health staff that he was being retaliated against by staff as a result of pending litigation he was pursuing against CDCR authorities for wrongs committed against

   (CONTINUED ON PAGES "3-A thru 3-I")

4. **Injury.** State how you were injured by the actions or inactions of the Defendant(s).
   As a result of actions (inactions) of defendants, plaintiff has suffered mental, emotional and physical injuries and suffers deprivation of a liberty interest.

5. **Administrative Remedies:**

   a. Are there any administrative remedies (grievance procedures or administrative appeals) available at your institution?  ☒ Yes  ☐ No

   b. Did you submit a request for administrative relief on Claim I?  ☒ Yes  ☐ No

   c. Did you appeal your request for relief on Claim I to the highest level?  ☒ Yes  ☐ No

   d. If you did not submit or appeal a request for administrative relief at any level, briefly explain why you did not. _____

3

1 him on behalf of CDCR authorities.

2 (6.) The plaintiff explained to mental health staff at New Folsom

3 Prison that after the stabbing incident occurred it was clear he

4 was being specifically targeted by CDCR administration officials

5 and that it was taking a great toll on him.

6 (7) The plaintiff explained to mental health staff the stabbing

7 incident was the third incident that occurred against him preceded by

8 A.) An incident at Pelican Bay State Prison when and where, the

9 prison administration placed a known documented enemy of the plaintiff

10 who was listed and ordered to be kept separate from him at the

11 same facility and on the same yard with the plaintiff in which a

12 serious physical altercation took place., B.) The plaintiff was

13 falsely charged in another matter by Pelican Bay Prison

14 administration soon after i.e., attempted murder of an inmate

15 who was found stabbed several times (much litigation followed).

16 (8.) After doing the best he could to explain the mental pain and

17 stress he was experiencing, the plaintiff expressed to mental

18 health staff his great need to be placed somewhere he could

19 sleep, be left alone and receive adequate mental health care

20 assistance.

21 (9) During a one-on-one mental health counseling session in the

22 month of October 2013 the plaintiff's mental health clinician

23 i.e., Dr. Lacy expressed her desire to help and assured the plaintiff

24 that she would speak to mental health authorities at New Folsom

25 Prison to see exactly what could be done to help him receive

26 adequate mental health assistance, and would request that the

27 plaintiff be held at New Folsom Prison until such inquries and

28 responses were completed.

Page "3-A"

1   10.) However, on October 29, 2013 the plaintiff was abruptly told by
2   correctional staff to pack his belongings because he was being
3   transferred to Kern Valley State Prison (KVSP).
4   11.) The plaintiff arrived to (KVSP) on October 30, 2013.
5   12.) On November 7, 2013 at (KVSP) the plaintiff was escorted to
6   an interview room and told that he had a phone call from a mental
7   health psychologist (i.e., Dr. Morgan) at New Folsom Prison Concerning
8   the (602 HCA) appeal that he filed before being transferred.
9   13.) Dr. Morgan asked the plaintiff via telephone if he was still
10  experiencing the same problems described in the (602 HCA)
11  The plaintiff answered "yes".
12  14.) Dr. Morgan then explained that due to the plaintiff being
13  transferred to another prison she could not address the matter
14  but that she would forward the entire to the assigned mental
15  health clinician at the new location.
16  15.) On November 13, 2013 the plaintiff was interviewed by his
17  newly assigned mental health clinician at (KVSP) i.e., Dr. Barajas,
18  for an initial interview.
19  16.) The plaintiff explained many things to Dr. Barajas including
20  that he was extremely depressed and could not deal with his
21  current living situation, that he was being retaliated against by
22  prison staff for pending litigation, that he had recently been
23  stabbed and felt the need for placement into a mental health
24  treatment facility where he could receive much needed assistance
25  with gathering himself and recooperating after what he recently
26  experienced.
27  17.) The plaintiff requested to Dr. Barajas as he did in his admini-
28  strative appeal to be transferred to an institution where he could

Page "3-B"

1  receive much needed mental health assistance and be left alone
2  to try to regain focus, balance and a sense of purpose.
3  (18.) Dr. Barajas responded to the plaintiff by indicating that he
4  would leave notes of mental health placement reccomendation for
5  plaintiff's upcoming prison classification committee hearing of 11/19/13.
6  (19.) On 11/19/13 during the plaintiff's initial classification committee
7  hearing he requested a transfer to a California Department of
8  Corrections institution that deals with mental health issues due
9  to being under extreme levels of stress and strain and being
10 unable to function properly under his living conditions.
11 (20.) The prison classification committee informed the plaintiff
12 that such reccomendations were to be made by his mental
13 health clinician (i.e., Dr. Barajas).
14 (21.) The plaintiff informed the classification committee that
15 Dr. Barajas assured him that he would put such reccomendation
16 in the notes for the classification committee.
17 (22.) After searching through the mental health area of the
18 plaintiff's prisoner file, the classification committee informed
19 him that no such notes from Dr. Barajas existed.
20 (23.) On 12/2/13 the plaintiff was seen again by Dr. Barajas
21 and asked him why he did not make reccomendations to the
22 classification committee as he indicated he would do.
23 (24.) Dr. Barajas stated "I didn't have a chance to get
24 to it."
25 (25.) On the same day of 12/2/13 the plaintiff asked Dr. Barajas
26 could he at least be placed in whatever group therapy, anger
27 management classes or whatever was available at (KVSP) so
28 that he could have regular contact with mental health

staff and inmate group therapy members who engage in mental health assistance / treatment.

26.) Dr. Barajas then stated "I will put you on the waiting list for group therapy.

27.) After several days passed, the plaintiff saw his regular prison custody counselor (Ms. Jaramillo) and inquired about how long it might take before he could begin mental health group therapy and/ or any other anger management type of classes that he was signed up for.

28.) The plaintiff's prison custody counselor informed him that there were no anger management, no group therapy or any such mental health programs anywhere at the facility and that none ever existed.

29.) On 12/16/13 the fact that no Anger Management or group therapy classes existed was confirmed by B. Mason (Supervising Psychiatric Social Worker) when he interviewed the plaintiff in response to his pending (HCA 602) at the second level of review.

30.) The second level appeal reviewer (B. Mason) informed the plaintiff that there were no mental health service groups, classes or otherwise at the facility.

31.) Mr. B. Mason informed the plaintiff that he was aware that the plaintiff's mental health clinician Dr. Barajas placed him on a waiting list for a group therapy program that actually did not exist.

32.) Mr. B. Mason concluded the interview with the plaintiff by informing him that he could arrange for the plaintiff seeing Dr. Barajas more frequently on a every 30 day basis for

Page "3-D"

1  one on one sessions if he would like.

2  (33.) The plaintiff informed Mr. B. Mason that due to what he
3  experienced of Dr. Barajas' untruthfulness, unprofessionalism
4  and carelessness not only did he want for a new mental
5  health clinician, but he would continue pursuing the matter of
6  being transferred to an appropriate institution altogether in
7  order to receive adequate mental health care treatment by
8  submitting his pending (602 HCA) to the next highest level
9  of review.

10  (34.) On January 8, 2014 the plaintiff received a written response
11  from the second level of his (602 HCA) indicating that his
12  request was officially denied by R.M. Hutchinson, Chief
13  Executive Officer of mental health services.

14  (35.) The response indicated that the denial was based on
15  the following; " The professional judgement of the mental
16  health staff working with you indicates that you are at the
17  appropriate level of mental health care ...., the rules governing
18  the issue are, California Code of Regulations, Title 15
19  Sections # 3350 - 3358."

20  (36.) On January 14, 2014 the plaintiff submitted his (602 HCA)
21  to the third and highest level of review (i.e., Deputy Directors
22  level.)

23  (37.) On or about March 30, 2014 the plaintiff received a final
24  third level of review response from defendant J. Lewis
25  (Deputy Director's level.)

26  (38.) The third and final level of review conducted by defendant
27  J. Lewis indicated that the plaintiff's appeal and action
28  requested was "denied".

39. The plaintiff reasons that the third level Director's review and decision is improper based on defendant J. Lewis' statement that, "There is no compelling evidence that warrants intervention at the director's level of review" ..... "You are receiving treatment deemed appropriate by trainned clinical staff" and, "you were offered an increase in frequency in seeing your primary clinician (i.e., Dr. Barajas) which you declined."

40. The plaintiff used the (602 HCA) process responsibly as his only means of address at the prison administrative level.

41. The plaintiff made clear in the area provided on the (602 HCA) form where it informs inmates to explain the reasons for requesting a third level review that, A.) it was improper, deceitful and unprofessional for his assigned mental health clinician to be untruthful and even go as far as to sign the plaintiff up for group therapy / anger management classes that did'nt even exist, B.) that he could not focus/functions on a daily basis in his living environment and needed serious help, and C.) he was placed in an institution that was well known for riots, shootings, extensive lockdowns and various other unproductive activity that was unconducive to plaintiff's state of being.

42. The plaintiff was suffering a traumatic experience before and after being transferred to (KVSP) and continuously sought mental health assistance.

43. After reviewing the response given by the Director of Health Care Services, (i.e., defendant J. Lewis) the plaintiff found himself re-visited by a mental strain that had

Page "3-F"

1  become unbearable.

2  (44.) The plaintiff was overtaken by a feeling of hopelessness

3  and despair with the reasoning there was no further remedy.

4  (45.) The plaintiff began to experience feelings of thinking he

5  would be better off dead than to suffer such pain and

6  mistreatment.

7  (46.) The plaintiff was again framed by (KVSP) administrative

8  staff and approached by prisoners in reaction to untruths

9  slandered against him by prison staff on May 1st, 2014.

10  (47.) A fight ensued between plaintiff and other prisoners on

11  May 1st, 2014 at which time staff shot and injured him with

12  a riot gun several times in addition to using flash bang

13  grenades.

14  (48.) After a prison lockdown status was raised, the plaintiff

15  was approached by another prisoner of a different race

16  (hispanic) and a fight ensued which triggered a full scale

17  racial riot in which other inmates were beaten and stabbed.

18  (49.) The plaintiff was in a place of hopelessness, stress and

19  saw no reason to avoid altercations as he had been doing

20  prior to being denied mental health assistance.

21  (50.) The plaintiff explained in his (602 HCA) that on occassions

22  he felt like harming others and knew that doing so would

23  result in him being put in a place where he would be left

24  alone but that he did not want to do that and instead

25  sought mental health assistance and placement into a

26  facility that helps mental health inmates/patients.

27  (51.) On August 4, 2014 the plaintiff was placed in (KVSP)

28  Administrative Segregation Unit (the hole) and charged with

1   battery on a inmate.

2   (52.) On August 12, 2014 the plaintiff was given a mental

3   health evaluation and was told by mental health staff that he

4   should have talked to somebody before having such an episode

5   which is when the plaintiff informed them that he in fact had

6   constantly tried to do so again and again verbally and via

7   written complaint.

8   (53.) It was determined by mental health staff that the

9   plaintiff's mental disorder did contribute to the behavior

10   that led to the incident and that if he was found guilty of

11   the administrative disciplinary action, the mental health

12   factors should be considered when assessing any penalty.

13   (54.) Upon learning that mental health treatment could

14   have actually been made available to him, the plaintiff

15   again filed an administrative complaint (602 HCA) seeking

16   answers and remedy.

17   (55.) On November 21, 2014 while being held in (KVSP) Administra-

18   tive Segregation the plaintiff was interviewed by defendant

19   R. M. Hutchinson.

20   (56.) R. M. Hutchinson informed the plaintiff that "somebody

21   slipped up" and that at the plaintiff's next Interdisciplinary

22   Treatment Team hearing he would be considered for Enhanced

23   Outpatient Program (E.O.P.) placement.

24   (57.) However, on or around January 20, 2015 (KVSP) administra-

25   tive staff informed the plaintiff that he was leaving on

26   transfer placement at Corcoran State Prison, Security

27   Housing Unit (SHU).

28   (58.) On January 23, 2015 the plaintiff arrived to Corcoran (SHU).

Page "3-H."

1   (59.) In his first meeting with mental health staff at Corcoran

2   Prison (SHU) (i.e., with Dr. Tepperman), the plaintiff explained his

3   circumstances of being considered for E.O.P. placement and the

4   mental difficulties he was facing.

5   (60.) The plaintiff's mental health clinician (Dr. Tepperman)

6   informed him that due to a recent legal court order at

7   CSP-Corcoran (SHU) many changes were taking place with

8   mental health services at Corcoran Prison including hiring of

9   New mental health staff, restructure of inmate housing,

10  inmate placement etc., and that because of these ongoing

11  changes he, the plaintiff, would be faced with many delays.

12  (61.) Around September 2015 the plaintiff's mental health

13  clinician (Dr. Tepperman) took a leave of absence.

14  (62.) The plaintiff was without a mental health clinician

15  approximately 6-8 weeks.

16  (63.) A different mental health clinician appeared around

17  November 2015 (i.e., Dr. Lester) but she was not properly

18  trained or helpful.

19

20

21

22

23

24

25

26

27

28

Page "3-I."

**CLAIM II**

1. State the constitutional or other federal civil right that was violated: 8th Amendment to the U.S. Constitution / Cruel and Unusual Punishment.

2. **Claim II.** Identify the issue involved. Check **only one**. State additional issues in separate claims.

   ☐ Basic necessities      ☐ Mail            ☐ Access to the court      ☐ Medical care
   ☐ Disciplinary proceedings   ☐ Property      ☐ Exercise of religion      ☐ Retaliation
   ☐ Excessive force by an officer   ☒ Threat to safety   ☐ Other: _____

3. **Supporting Facts.** State as briefly as possible the FACTS supporting Claim II. Describe exactly what **each Defendant** did or did not do that violated your rights. State the facts clearly in your own words without citing legal authority or arguments.

   (1.) On January 12, 2016 the plaintiff was approached at his cell front by his Correctional Custody Counselor (J. Torres) and told that his (SHU) term would possibly be over in approximately 60 days, and then asked which institution would he seek for being transferred to.

   (2.) The plaintiff informed his Correctional Custody Counselor that he was not interested in any of the institutions to choose from and instead needed placement at an institution that deals in placement of inmates in need of mental health treatment.

   (3.) On 1/12/16 before a classification committee was held to determine what would be done with the plaintiff, the plaintiff gave his Correctional Custody Counselor (J. Torres) a two page statement that he prepared which described his recent mistreatments in California Department of Corrections (CDC).

   (4.) The plaintiff asked Correctional Counselor J. Torres if his written statement would be made part of the classification committee record. She then read the statement and said "Yes" and kept the statement.

   (5.) The written statement, explained indepth the atrocities and the injustices that the plaintiff suffered at (KVSP) which is where he received the (SHU) term as well as other (CDC) locations where he experienced similar problems.

   (CONTINUED ON PAGES "4-A" thru 4-B")

4. **Injury.** State how you were injured by the actions or inactions of the Defendant(s).

   As a result of actions (inactions) of defendants, plaintiff has suffered mental, emotional and physical injuries and suffers deprivation of a liberty interest.

5. **Administrative Remedies.**

   a. Are there any administrative remedies (grievance procedures or administrative appeals) available at your institution?                                                                          ☒ Yes   ☐ No

   b. Did you submit a request for administrative relief on Claim II?                    ☒ Yes   ☐ No

   c. Did you appeal your request for relief on Claim II to the highest level?        ☒ Yes   ☐ No

   d. If you did not submit or appeal a request for administrative relief at any level, briefly explain why you did not. _____

4

6.) The plaintiff specifically explained to Counselor J. Torres verbally and in his written statement the cruel injustices he suffered at Kern Valley State Prison (KVSP).

7.) The classification Committee was held on 1/14/16 with the plaintiff in absentia.

8.) A few days after the committee hearing was conducted the plaintiff received a classification committee chrono in the mail which indicated all of the actions and decisions made by the committee.

9.) The chrono showed that not only did Counselor J. Torres fail to mention or enter any of the plaintiff's written statements into the committee record but, the committee chrono indicated that A.) she reccomended the plaintiff be transferred back to the Same prison yard at (KVSP) where he clearly expressed to her he had been set up and retaliated against and resulted in a racial riot, B.) she (J. Torres) indicated that it was the place of plaintiff's personal preference and C.) that it was near his family location.

10.) After receiving the chrono in the mail plaintiff immediately filed an administrative complaint (602 Appeal) expressing the fact that he made clear to Counselor J. Torres that (KVSP) was the prison where his well being was threatened and he was set up and retaliated against by (KVSP) administrative officials to the point where his family had to contact the warden of (KVSP) and the Inspector General of CDCR.

11.) On 2/3/16 the plaintiff was moved from Corcoran State Prison (SHU) into Corcoran Prison's Short Term Restricted Housing Unit (STRHU) awaiting transfer to (KVSP).

Page "4-A"

1  (12.) On or about 2/23/16 the plaintiff received a first level
2  review investigation for the administrative appeal. The interview
3  was conducted by M. Hoggard.
4  (13.) The plaintiff verbally reiterated to M. Hoggard all of the
5  facts including, that it was well documented that Kern Valley
6  Prison is very far away from his family residence (over 225
7  miles.)
8  (14.) The plaintiff stated to Counselor M. Hoggard that it was
9  obvious that Counselor J. Torres had something personal
10  against him in order to commit such an act against him by
11  sending him right back into a hostile environment where he
12  was already at the center of a racial riot where many prisoners
13  had been beaten and stabbed and where prison staff had
14  retaliated against him.
15  (15.) Defendant M. Hoggard stated that he was going to leave
16  the situation the same as it was and that he wasn't
17  going to go against his co-worker's decision.
18  (16.) Defendant M. Hoggard was very cynical and stated "Enjoy
19  your trip back to Kern Valley" before walking away.
20
21
22
23
24
25
26
27
28

Page "4-B"?

## CLAIM III

1.  State the constitutional or other federal civil right that was violated: Eighth Amendment to the U.S. Constitution / Cruel and Unusual Punishment.

2.  **Claim III.** Identify the issue involved. Check **only one**. State additional issues in separate claims.

☐ Basic necessities ☐ Mail ☐ Access to the court ☐ Medical care
☐ Disciplinary proceedings ☐ Property ☐ Exercise of religion ☐ Retaliation
☒ Excessive force by an officer ☐ Threat to safety ☐ Other: _____.

3.  **Supporting Facts.** State as briefly as possible the FACTS supporting Claim III. Describe exactly what **each Defendant** did or did not do that violated your rights. State the facts clearly in your own words without citing legal authority or arguments.

(1.) On 3/18/16 a correctional sergeant (i.e., Sgt. Kellog) appeared at the cell door of plaintiff at Corcoran State Prison, Short Term Restricted Housing Unit (STRHU) informing plaintiff to pack his belongings because he would soon be in route on transfer back to Kern Valley prison general population.

(2.) The plaintiff informed the correctional sergeant that it would be improper for him to comply with such a request because he just finished serving an eighteen month SHU term for assaultive actions against another prisoner of a different race, at Kern Valley State Prison which triggered a full scale racial riot where, many inmates were stabbed, beaten, pepper sprayed and shot with riot guns.

(3.) Additionally, plaintiff informed the correctional sergeant that he had a mental health hearing scheduled in four days on 7/22/16 in which his mental health clinician, Dr. Vasilescu assured him that his level of mental

(CONTINUED ON PAGES "5-A thru 5-F")

4.  **Injury.** State how you were injured by the actions or inactions of the Defendant(s).

As a result of actions(inactions) of defendants, plaintiff has suffered mental, emotional and physical injuries and suffers deprivation of a liberty interest.

5.  **Administrative Remedies.**

    a.  Are there any administrative remedies (grievance procedures or administrative appeals) available at your institution? ☒ Yes ☐ No

    b.  Did you submit a request for administrative relief on Claim III? ☒ Yes ☐ No

    c.  Did you appeal your request for relief on Claim III to the highest level? ☒ Yes ☐ No

    d.  If you did not submit or appeal a request for administrative relief at any level, briefly explain why you did not. _____.

**If you assert more than three Claims, answer the questions listed above for each additional Claim on a separate page.**

health care treatment was going to be elevated and then he would
be appropriately housed at a mental health care facility.

(4.) Plaintiff further explained to another sergeant who appeared
at his cell door (i.e., Sergeant Lawson) that what led to the
initial incident which caused the racial riot at Kern Valley
Prison was mental health issues plaintiff suffered from and
had sought help for while in Kern Valley Prison general
population but was denied.

(5.) Plaintiff explained to sergeant Lawson that he was now on
track to finally receive much needed mental health treatment
at the hearing scheduled for him in four days.

(6.) Sergeant Lawson informed plaintiff that he would pass
along such information to his Correctional Captain (i.e., Captain
Gallagher.)

(7.) Correctional Sergeant Lawson appeared at plaintiff's cell
again on 3/19/16 to inform plaintiff that he spoke to the
Correctional Captain via telephone and the Captain did not care
about any of the things he was informed of and insisted that
plaintiff pack his belongings to head out for transfer back
to Kern Valley State Prison.

(8.) Plaintiff again informed the Correctional sergeant that
there were critical issues that needed to be addressed and
that it was becoming too much of a stressful matter for him.

(9.) Plaintiff was a patient in the Correctional Clinical Case
Management System (CCCMS) and requested to speak to
his mental health clinician.

(10.) Correctional Sergeant Lawson informed plaintiff that it
would not be possible to speak to his clinician until she

Page "5-A"

1  arrived back to work on Monday 3/21/16.

2  (11.) On Sunday 3/20/16 Sergeant Lawson delivered a final message
3  from Correctional Captain Gallagher to the plaintiff that he " Better
4  pack his shit and if not he is coming tommarrow with the force
5  of hell to drag his ass on the bus without his personal property"
6  (12.) On monday morning 3/21/16 the plaintiff was approached
7  at his cell front by an unknown Correctional sergeant and asked
8  " Are you gonna pack your property and get on the bus?"
9  (13.) Plaintiff responded by informing the Correctional sergeant that
10  he was not going to do anything until he spoke with his
11  mental health Clinician.

12  (14.) The Correctional sergeant then locked plaintiff's trayslot
13  door and went to the plumbing chase and turned off the water
14  to the sink and toilet in the cell.

15  (15.) After a couple of hours passed, plaintiff's mental health
16  clinician, Dr. Vasilescu, arrived at his cell and informed him
17  that she informed all Correctional staff that he was scheduled
18  to have a mental health care hearing wensday 3/22/16 to have
19  his level of Care elevated and receive the appropriate mental
20  health treatment that was needed.

21  (16.) Shortly after plaintiff's mental health care clinician left
22  his cell, a Correctional Lieutenant (i.e., Lieutenant Silva)
23  appeared at his cell front ordering plaintiff to be handcuffed
24  so that he can be put on the transportation bus.

25  (17.) Plaintiff responded telling the Correctional Lieutenant that he
26  was not going to do so because he was scheduled to get the
27  mental health assistance that he had been desparately
28  waiting for and that there was a mishandling of his case

Page " 5-B "

1   at the classification committee in that he should not be sent
2   back to Kern Valley Prison where serious problems occurred.
3   (18.) Correctional Lieutenant E. Silva left briefly and returned
4   with a cart containing tear gas, helmets, sheilds and other
5   special equipment. The cart was placed in front of plaintiff's
6   cell.
7   (19.) Correctional Captain Gallagher appeared at plaintiff's cell
8   front after awhile.
9   (20.) Captain Gallagher informed plaintiff that he was already
10  aware of the situation but that "Anyway it goes, you're
11  getting on that bus".
12  (21.) Captain Gallagher asked the plaintiff, "Is it gonna be
13  the easy way or the hard way"?
14  (22.) The plaintiff then told him that he needed to speak
15  to his mental health clinician.
16  (23.) Captain Gallagher responded, "You can talk to her after
17  we drag your ass out of there".
18  (24.) Captain Gallagher then informed the correctional Lieutenant
19  and other correctional staff officers to suit up and prepare
20  to extract plaintiff from the cell.
21  (25.) In the background several feet away from the plaintiff's
22  cell mental health clinician (Dr. Vasilescu) could be heard
23  asking, "May I speak to him before you do that?"
24  (26.) Captain Gallagher responded, "No, you can talk to him
25  after we bring him out."
26  (27.) After several correctional officers put on gas masks,
27  jumpsuits, helmets and prepared with sheilds, Captain Gallagher
28  commanded a tear gas grenade be tossed into plaintiff's cell

Page "5-c"

1  which was followed by plaintiff being pepper-sprayed as he layed

2  violently choking for over five minutes. The cell door was then

3  opened and several officers leaped and fell on plaintiff's back injuring

4  his lower back and right leg then handcuffed him and dragged him

5  out of the cell.

6  28.) Plaintiff is a chronic asthmatic and suffered an asthma attack.

7  29.) Plaintiff was left to lay cold and shivering for approximately

8  90 minutes on a gurney while handcuffed and shakeled unable to

9  decontaminate after being pepper-sprayed.

10  30.) Plaintiff was then thrown by two correctional officers into

11  the back of a transportation van while handcuffed and shackled

12  and taken to Kern Valley State Prison.

13  31.) Plaintiff arrived to Kern Valley State Prison in the afternoon

14  of 3/21/16.

15  32.) Barely able to walk, plaintiff was escorted to a housing unit

16  cell with no medical attention.

17  33.) After a day of laying in pain and unable to gather himself,

18  plaintiff was admitted to a mental health crisis bed at Kern

19  Valley State Prison on 3/23/16.

20  34.) Upon arrival to the mental health crisis unit, mental health

21  staff continued to question plaintiff and correctional staff why

22  and how was he transferred back to Kern Valley Prison.

23  35.) Mental health staff at Kern Valley Prison checked computer

24  records and contacted plaintiff's previous mental health clinician

25  (Dr. Vasilescu) at his previous housing location and confirmed

26  that his mental health care level had been elevated and the

27  hearing to offically have it documented was interrupted

28  by the transfer.

36.) Kern Valley Prison mental health staff conducted and completed a classification committee hearing with the plaintiff in absentia and declared the plaintiff unfit for Kern Valley State Prison (KVSP) general population and recommended immediate transfer to a qualified facility that houses Enhanced Outpatient Program (E.O.P) inmates.

37.) On or about April 5th 2016 plaintiff was informed by mental health staff in the mental health crisis unit that in order to be transferred from (KVSP) to a proper mental health care prison he would have to discharge from the mental health crisis unit to (KVSP) general population to be seen by a (KVSP) classification committee so that his transfer could be re-directed to a proper mental health care treatment prison.

38.) Plaintiff discharged from (KVSP) mental health crisis unit to (KVSP) general population on or around April 6, 2016.

39.) When back at (KVSP) general population, plaintiff was held confined to quarters (in his cell) as an unclassified inmate until April 12, 2016.

40.) On 4/12/16 while in a holding cage waiting for classification committee, plaintiff spoke to Captain J. Acebedo and told him that it was not right for him to be back at (KVSP) and didn't know how or why the transfer was made when everyone was aware of his previous actions at (KVSP) that resulted in a full scale racial riot.

41.) Captain J. Acebedo stated to the plaintiff that it did'nt matter because he was going to be classified as an E.O.P inmate and would be transferred because he could'nt be housed amongst NON-E.O.P inmates.

42.) Later on that day of 4/12/16 plaintiff was classified by (KVSP) classification committee as an E.O.P inmate in need of urgent transfer to a proper mental health care treatment facility.

43.) After being classified, plaintiff returned to his housing unit and was told by his unit floor officer, "Now that you've been to

Page " 5- E."

1   Classification Committee if you wanna go trade in your orange
2   jumpsuit for blue deniums and get all the rest of your laundry
3   from the laundry room go and get it yourself."
4   (44.) Plaintiff was released from his housing unit, reported to the
5   prison laundry room, received his clothing and then returned to
6   his housing unit.
7   (45.) When returning back to his housing unit, plaintiff was told by
8   his unit's control booth officer, " You can't come back inside until
9   yard time is over."
10  (46.) Plaintiff informed the control booth officer that he only went
11  to get clothing and that he was an E.O.P inmate waiting to leave
12  and shouldn't even be on the yard.
13  (47.) The control booth officer looked at papers in his possession
14  and stated, "I don't see anything about E.O.P, you've been
15  cleared for yard and program."
16  (48.) Plaintiff walked away and stood waiting for yard recall.
17  (49.) While waiting for yard recall plaintiff was approached and
18  hit from behind and knocked unconscious.
19  (50.) Plaintiff was rushed by ambulance to Delano Regional Medical
20  Center where he remained unconscious for several hours.
21  (51.) Plaintiff regained consciousness hours later and was told
22  by doctors, "You're lucky you're not brain-dead".
23  (52.) Plaintiff suffered severe head injuries i.e., extensive
24  swelling, busted eye socket, stitches, great pain and inability
25  to move about or walk properly for several weeks.
26  (53.) Plaintiff suffers chronic Glaucoma in his right eye as a
27  result of this occurrence and continues to receive treatment.
28

## E.  REQUEST FOR RELIEF

State the relief you are seeking:

① The court enter judgement declaring the acts of defendants R.M. Hutchinson, J. Lewis, J. Torres, M. Hoggard and J. Gallagher described above to be in violation of the Eighth and Fourteenth Amendment, ②.) The court exercise the powers of supplemental Jurisdiction as it relates to state court laws violated by defendant J. Acebedo, ③.) Award plaintiff compensatory and punitive monetary damages in an amount to be determined at trial, ④.) Preliminarily and permanately enjoin defendants, their agents, employees and all persons acting in concert with them from subjecting plaintiff to the unconstitutional and unlawful acts as described above, and ⑤.) Award any and all other relief that the court deems proper.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 14, 2016
                DATE

SIGNATURE OF PLAINTIFF

_____
(Name and title of paralegal, legal assistant, or
other person who helped prepare this complaint)

_____
(Signature of attorney, if any)

_____
_____
(Attorney's address & telephone number)

## ADDITIONAL PAGES

All questions must be answered concisely in the proper space on the form. If you need more space you may attach more pages, but you are strongly encouraged to limit your complaint to twenty-five pages. If you attach additional pages, be sure to identify which section of the complaint is being continued and number all pages. Remember, there is no need to attach exhibits to your complaint.