UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TOY TERRELL SMITH,<br><br>　　　　Plaintiff,<br><br>　v.<br><br>M. HOGGARD, *et al*.,<br><br>　　　　Defendants. | Case No. 1:16-cv-01924-AWI-EPG<br><br>FINDINGS AND RECOMMENDATIONS TO DISMISS CLAIMS CONSISTENT WITH MAGISTRATE JUDGE'S PRIOR ORDER IN LIGHT OF <u>WILLIAMS</u> DECISION<br><br>(ECF Nos. 10 & 11)<br><br>OBJECTIONS, IF ANY, DUE WITHIN FOURTEEN (14) DAYS |

Toy Terrell Smith ("Plaintiff") is a state prisoner proceeding *pro se* and *in forma pauperis* in this civil rights action filed pursuant to 42 U.S.C. § 1983. Plaintiff consented to magistrate judge jurisdiction. (ECF No. 6.) Defendants have not yet consented to magistrate judge jurisdiction or declined to consent to magistrate judge jurisdiction.

The Court previously screened Plaintiff's First Amended Complaint before Defendants appeared. (ECF No. 11). The Court found that Plaintiff stated a cognizable claim against defendants J. Torres, M. Hoggard, and J. Acebedo for violation of Plaintiff's Eighth Amendment rights for a failure to protect. (<u>Id</u>. at 14.) However, the Court found that Plaintiff failed to state a cognizable claim for deliberate indifference to serious medical needs in violation of the Eighth Amendment. (<u>Id</u>. at 11-12.) Additionally, the Court found that Plaintiff did not state a cognizable claim for excessive force in violation of the Eighth Amendment. (<u>Id</u>. at 11-12.)

As described below, in light of Ninth Circuit authority, this Court is recommending that the assigned district judge dismiss claims and defendants consistent with the order by the magistrate judge at the screening stage.

I.　**<u>WILLIAMS v. KING</u>**

On November 9, 2017, the United States Court of Appeals for the Ninth Circuit held

that a magistrate judge lacked jurisdiction to dismiss a prisoner's case for failure to state a claim at the screening stage where the Plaintiff had consented to magistrate judge jurisdiction and defendants had not yet been served. Williams v. King, 875 F.3d 500 (9th Cir. 2017). Specifically, the Ninth Circuit held that "28 U.S.C. § 636(c)(1) requires the consent of all plaintiffs and defendants named in the complaint—irrespective of service of process—before jurisdiction may vest in a magistrate judge to hear and decide a civil case that a district court would otherwise hear." Id. at 501.

Here, the defendants were not served at the time the Court issued its order dismissing claims and defendants, and therefore had not appeared or consented to magistrate judge jurisdiction. Accordingly, the magistrate judge lacked jurisdiction to dismiss claims and defendants based solely on Plaintiff's consent.

In light of the holding in Williams, this Court will recommend to the assigned district judge that he dismiss the claims and defendants previously dismissed by this Court, for the reasons provided in the Court's screening order.

## II. SCREENING REQUIREMENT

The Court is required to screen complaints brought by prisoners seeking relief against a governmental entity or an officer or employee of a governmental entity. 28 U.S.C. § 1915A(a). The Court must dismiss a complaint or portion thereof if the prisoner has raised claims that are legally "frivolous or malicious," that fail to state a claim upon which relief may be granted, or that seek monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915A(b)(1), (2). "Notwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss the case at any time if the court determines that the action or appeal fails to state a claim upon which relief may be granted." 28 U.S.C. § 1915(e)(2)(B)(ii).

A complaint is required to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Detailed factual allegations are not required, but "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007)). Plaintiff must set forth "sufficient

factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Id. (quoting Twombly, 550 U.S. at 570). The mere possibility of misconduct falls short of meeting this plausibility standard. Id. at 679. While a plaintiff's allegations are taken as true, courts "are not required to indulge unwarranted inferences." Doe I v. Wal-Mart Stores, Inc., 572 F.3d 677, 681 (9th Cir. 2009) (internal quotation marks and citation omitted). Additionally, a plaintiff's legal conclusions are not accepted as true. Iqbal, 556 U.S. at 678.

Pleadings of *pro se* plaintiffs "must be held to less stringent standards than formal pleadings drafted by lawyers." Hebbe v. Pliler, 627 F.3d 338, 342 (9th Cir. 2010) (holding that *pro se* complaints should continue to be liberally construed after Iqbal).

### III.  SUMMARY OF PLAINTIFF'S FIRST AMENDED COMPLAINT

Plaintiff's First Amended Complaint (ECF No. 10), describes how he first filed an appeal claiming he was denied mental health care treatment in December, 2013. At that time, Plaintiff was a mental health patient in the Correctional Clinical Case Management System (CCCMS). Plaintiff had spoken to his mental health clinician and explained how he could not function properly after suffering a sequence of traumatic occurrences including being stabbed by an unknown inmate. Plaintiff believed he was being targeting in a retaliatory fashion by the staff. "Plaintiff expressed that the felt troubled to the point that he felt he would be better off harming someone if that's what it took for him to be placed somewhere he could be left alone and receive proper mental health treatment in order to deal with his issues."

The prison appeals staff, Dr. Hutchinson, refused to meet with Plaintiff and instead issued a written response to Plaintiff's appeal based on a Licensed Clinical Social Worker's report after that social work had interviewed the Plaintiff. The social worker had suggested that "It could be arranged for Plaintiff to see his primary clinician at closer intervals than had been previously scheduled." However, this was unacceptable to Plaintiff because Plaintiff's primary clinician had been misleading by suggesting that Plaintiff could be on a wait list for group therapy and anger management when those programs did not exist. The social worker also confirmed that the prison where Plaintiff was residing did not have any mental health programs. Dr. Hutchinson responded to Plaintiff's appeal by writing "It is the professional

judgment of the mental health staff working with you that you are at the appropriate level of mental health treatment." Plaintiff appealed this decision.

After receiving further denials of Plaintiff's appeals, Plaintiff became hopeless, depressed, unfocused and lost faith in mental health care services at Kern Valley State Prison (KVSP). On May 1, 2014, Plaintiff suffered a mental breakdown and reacted aggressively when confronted by another prisoner, causing a serious prison disturbance in which Plaintiff was shot twice by correctional staff with a riot gun. Plaintiff continued to tell mental health staff that he could not focus or function properly. Plaintiff was placed back in general population.

On August 5, 2014, after all black inmates were released from an extended emergency prison lockdown, Plaintiff was approached by a prison of the Hispanic race. Plaintiff attacked that prisoner. Correctional officers separated Plaintiff using force and handcuffed Plaintiff and the prisoner that Plaintiff had attacked. Plaintiff's attack on that prisoner ignited a full scale prison racial riot in which many prisoners were stabbed, beaten and hospitalized.

Plaintiff was then placed in Administrative Segregation Unit and charged with battery on an inmate and starting a prison riot.

On August 12, 2014, Plaintiff was interviewed for a mental health evaluation by Dr. M. Rodriguez to determine if Plaintiff had a mental disorder that contributed to the action of Plaintiff attacking another inmate. That doctor reasoned that Plaintiff's mental disorder did in fact contribute to the disturbance and suggested that Plaintiff's mental health factors be taken into account when assessing any penalty on Plaintiff. Plaintiff's mental health evaluation team told Plaintiff he should have spoken to someone about his problems before. Plaintiff stated he had told people about his problems many times before.

On September 8, 2014, Plaintiff filed an administrative health care appeal questioning why he did not get mental health treatment and appropriate housing for future mental health treatment. On November 21, 2014, Senior Psychologist Supervisor Dr. Gunther interviewed Plaintiff. After reviewing the matter, Dr. Gunther stated "somebody slipped up?" Dr. Gunthen then informed Plaintiff that he could have his mental health care treatment elevated to

Enhanced Outpatient Program (EOP) status. However, when Plaintiff was transferred to Corcoran State Prison Security Housing Unit (SHU), he did not first receive his EOP status regarding his mental health.

Plaintiff then served a fifteen month term in the SHU for battery on an inmate and starting a riot, Plaintiff's case was brought before a classification committee to determine his prison programming. Approximately two or three days before the classification committee hearing, Defendant J. Torres told Plaintiff that the hearing was going to take place in the next few days. J. Torres showed Plaintiff a list of approximately five or six prisons to choose from for his housing placement. Plaintiff rejected all five prisons on the basis that they did not have sufficient mental health care treatment. Plaintiff explained that he was supposed to have his mental health care elevated.

On January 12, 2016, Plaintiff handed defendant J. Torres a 2-page written statement that he prepared and asked if she would make it part of the record. J. Torres said yes. Plaintiff also said that anything other than being placed into a program for mental health issues "would not work for him because what happened to him recently in the general population had taken a serious toll on him." J. Torres, as the third member of the Institutional Classification Committee at Corcoran State Prison was obligated by institutional policy to express Plaintiff's needs, concerns, case factors and requests.

Plaintiff received the results of the Classification Committee meeting. It showed that J. Torres chose not to enter Plaintiff's written statement. J. Torres had recommended that Plaintiff be sent back to KVSP, although that was where the racial riot had occurred. Plaintiff appealed this decision. During an interview regarding the appeal, Plaintiff explained that the KVSP presented safety concerns and also was over two-hundred miles away from Plaintiff's home. Plaintiff said there were five other prisons she could have selected. The appeal staff, M. Hoggard, decided to leave the placement decision in place. Defendant M. Hoggard stated "Enjoy your trip back to Kern Valley," before walking away.

On March 21, 2016, Plaintiff was forced back to KVSP. On March 23, 2016, Plaintiff was admitted to KVSP Correctional Treatment Center and placed into a mental crisis bed. The

mental health treatment team determined that Plaintiff was unsuited for general population and should not have been transferred to KVSP. Plaintiff's mental health care statuts was elevated to EOP.

Nevertheless, on April 8, 2016, Plaintiff was discharged from the mental health treatment center and put in the general population at KVSP as an unclassified inmate held confined to quarters awaiting classification.

On April 12, 2016, Plaintiff appeared before KVSP classification committee, who determined Plaintiff would be placed on an urgent transfer to another institution because he was an EOP status inmate. Facility Captain J. Acebedo, a defendant, was chairman of the KVSP classification committee. When Plaintiff was escorted back to his housing unit after classification committee, he heard his name called by unit control tower officer informing him to report to the prison laundry room to receive his prison clothing. Plaintiff did so and then reported back to his housing unit. As Plaintiff waiting for entry to his housing unit, the control booth officer informed him he had to wait to be left in at the end of yard time. Plaintiff responded that he was an EOP inmate and should not even be on the yard. The officer looked at his papers and stated that nothing identified Plaintiff as an EOP inmate. The officer told Plaintiff to wait until yard time was over before he came in. After the classification committee hearing on April 12, 2016, it was defendant J. Acebedo's responsibility as chairman of the committee to immediately put all correctional staff on notice that Plaintiff was an EOP inmate, and thus must be kept separate from the general population or under correctional staff escort at all times.

As Plaintiff staff waiting for yard to be recalled, he was approached from behind by an unknown inmate and knocked unconscious. Plaintiff remained in an unconscious state and was rushed by ambulance to Delano Regional Medical Center. Plaintiff suffered severe head injuries. Plaintiff suffers glaucoma in his right eye as a result of this occurrence.

Finally, Plaintiff describes how on March 21, 2016, Plaintiff was waiting transfer back to Kern Valley State Prison. Defendant J. Gallagher was facility captain. Approximately three days before the scheduled transfer, Plaintiff was told by a correctional sergeant that he needed

to pack all of his belongings. Plaintiff explained to the sergeant the facts of how his case had been mishandled and how he had not received an adequate amount of mental health treatment. Defendant Gallagher responded that he did not care about any of that and Plaintiff "Better pack his shit and if not, he is coming with the force of hell to drag his ass on the bus without his personal property." On the morning of March 21, 2016, Plaintiff was approached at his cell front by an unknown sergeant and asked "Are you gonna pack your property and get on the bus?" Plaintiff responded that he wasn't going to do anything until he spoke to his mental health clinician. The correctional sergeant then locked Plaintiff's tray slot door and went to the plumbing chase and turned off the water to the sink and toilet in his cell. Plaintiff's mental health clinician, Dr. Vasilescu, informed Plaintiff that he was scheduled to have a mental health care hearing in two days. A correctional Lieutenant appeared and ordered Plaintiff to be handcuffed so that he could be put on the transportation bus. Plaintiff told the correctional lieutenant that he was not going to do so because he was scheduled to get mental health assistance and that there was a mishandling of his case. Correctional Lieutenant Silva left briefly and returned with a cart containing tear gas, helmets, shields and other special equipment. The cart was placed in front of Plaintiff's cell. Correctional captain appeared at Plaintiff's cell front and said his was aware of the situation but "Anyway it goes, you're getting on that bus." Captain Gallagher asked Plaintiff, "Is it gonna be the easy way or the hard way?" Plaintiff told him he needed to speak with his mental health clinician. Captain Gallagher responded, "You can talk to her after we drag your ass out of here." Captain Gallagher then informed the Lieutenant and staff to suit up and prepare to extract Plaintiff. Captain Gallagher would not allow Plaintiff to speak with his mental health clinician further.

Several correctional officers put on gas masks, jump suits, helmets, and shields. Captain Gallagher commanded that a tear gas grenade be tossed into Plaintiff's cell, which was followed by Plaintiff being pepper-sprayed as he lay violently choking for over five minutes. The cell door was then opened and several officers leaped and fell on Plaintiff's back injuring his lower back and right leg. They then handcuffed him and dragged him out of the cell.

Plaintiff is a chronic asthmatic and suffered an asthma attack. Plaintiff was left to lay cold and shivering for approximately 90 minutes on a gurney while handcuffed and shackled without being given a chance to decontaminate. Plaintiff was then thrown into the back of a transportation van to KVSP.

## IV. ANALYSIS OF PLAINTIFF'S CLAIMS

### A. Section 1983 Legal Standards

The Civil Rights Act under which this action was filed provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

42 U.S.C. § 1983. "[Section] 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" Graham v. Connor, 490 U.S. 386, 393-94 (1989) (quoting Baker v. McCollan, 443 U.S. 137, 144 n.3 (1979)); see also Chapman v. Houston Welfare Rights Org., 441 U.S. 600, 618 (1979); Hall v. City of Los Angeles, 697 F.3d 1059, 1068 (9th Cir. 2012); Crowley v. Nevada, 678 F.3d 730, 734 (9th Cir. 2012); Anderson v. Warner, 451 F.3d 1063, 1067 (9th Cir. 2006).

To state a claim under section 1983, a plaintiff must allege that (1) the defendant acted under color of state law, and (2) the defendant deprived him of rights secured by the Constitution or federal law. Long v. County of Los Angeles, 442 F.3d 1178, 1185 (9th Cir. 2006); see also Marsh v. Cnty. of San Diego, 680 F.3d 1148, 1158 (9th Cir. 2012) (discussing "under color of state law"). A person deprives another of a constitutional right, "within the meaning of § 1983, 'if he does an affirmative act, participates in another's affirmative act, or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made.'" Preschooler II v. Clark Cnty. Sch. Bd. of Trs., 479 F.3d 1175, 1183 (9th Cir. 2007) (quoting Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978)). "The requisite

causal connection may be established when an official sets in motion a 'series of acts by others which the actor knows or reasonably should know would cause others to inflict' constitutional harms." Preschooler II, 479 F.3d at 1183 (quoting Johnson, 588 F.2d at 743). This standard of causation "closely resembles the standard 'foreseeability' formulation of proximate cause." Arnold v. Int'l Bus. Mach. Corp., 637 F.2d 1350, 1355 (9th Cir. 1981); see also Harper v. City of Los Angeles, 533 F.3d 1010, 1026 (9th Cir. 2008).

Supervisory personnel are generally not liable under section 1983 for the actions of their employees under a theory of *respondeat superior* and, therefore, when a named defendant holds a supervisory position, the causal link between him and the claimed constitutional violation must be specifically alleged. See Fayle v. Stapley, 607 F.2d 858, 862 (9th Cir. 1979); Mosher v. Saalfeld, 589 F.2d 438, 441 (9th Cir. 1978), cert. denied, 442 U.S. 941 (1979). To state a claim for relief under section 1983 based on a theory of supervisory liability, Plaintiff must allege some facts that would support a claim that the supervisory defendants either: personally participated in the alleged deprivation of constitutional rights; knew of the violations and failed to act to prevent them; or promulgated or "implemented a policy so deficient that the policy 'itself is a repudiation of constitutional rights' and is 'the moving force of the constitutional violation.'" Hansen v. Black, 885 F.2d 642, 646 (9th Cir. 1989) (internal citations omitted); Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989). For instance, a supervisor may be liable for his "own culpable action or inaction in the training, supervision, or control of his subordinates," "his acquiescence in the constitutional deprivations of which the complaint is made," or "conduct that showed a reckless or callous indifference to the rights of others." Larez v. City of Los Angeles, 946 F.2d 630, 646 (9th Cir. 1991) (internal citations, quotation marks, and alterations omitted).

V. **EVLUATION OF PLAINTIFF'S EIGHTH AMENDMENT CLAIMS BASED ON DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS**

B. **Legal Standards**

Section 1983 provides a cause of action against any person who, under color of state law, "subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation

of any rights, privileges, or immunities secured by the Constitution." 42 U.S.C. § 1983. "A person 'subjects' another to the deprivation of a constitutional right, within the meaning of section 1983, if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made." Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978). "In a § 1983 action, the plaintiff must also demonstrate that the defendant's conduct was the actionable cause of the claimed injury. To meet this causation requirement, the plaintiff must establish both causation-in-fact and proximate causation." Harper v. City of L.A., 533 F.3d 1010, 1026 (9th Cir. 2008) (internal citations omitted). Proximate cause requires "'some direct relation between the injury asserted and the injurious conduct alleged.'" Hemi Group, LLC v. City of New York, 559 U.S. 1, 130 (2010) (quoting Holmes v. Secs. Investor Prot. Corp., 503 U.S. 258, 268 (1992)).

"[T]o maintain an Eighth Amendment claim based on prison medical treatment, an inmate must show 'deliberate indifference to serious medical needs.'" Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006), (quoting Estelle v. Gamble, 429 U.S. 97, 104 (1976)). This requires plaintiff to show (1) "a 'serious medical need' by demonstrating that 'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain,' " and (2) "the defendant's response to the need was deliberately indifferent." Id. (quoting McGuckin v. Smith, 974 F.2d 1050, 1059-60 (9th Cir. 1992) (citation and internal quotations marks omitted), overruled on other grounds WMX Technologies v. Miller, 104 F.3d 1133 (9th Cir. 1997) (en banc)). "The existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain are examples of indications that a prisoner has a 'serious' need for medical treatment." McGuckin, 974 F.2d at 1059–60 (citing Wood v. Housewright, 900 F.2d 1332, 1337–41 (9th Cir. 1990) (citing cases); Hunt v. Dental Dept., 865 F.2d 198, 200–01 (9th Cir. 1989)).

Deliberate indifference is established only where the defendant *subjectively* "knows of and disregards an *excessive risk* to inmate health and safety." Toguchi v. Chung, 391 F.3d

1051, 1057 (9th Cir. 2004) (emphasis added) (citation and internal quotation marks omitted). Deliberate indifference can be established "by showing (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference." Jett, 439 F.3d at 1096 (citation omitted). Civil recklessness (failure "to act in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known") is insufficient to establish an Eighth Amendment violation. Farmer v. Brennan, 511 U.S. 825, 836-37 & n.5 (1994) (citations omitted).

A difference of opinion between an inmate and prison medical personnel—or between medical professionals—regarding appropriate medical diagnosis and treatment is not enough to establish a deliberate indifference claim. Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989); Toguchi, 391 F.3d at 1058. Additionally, "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." Estelle, 429 U.S. at 106.

### C. Application to Plaintiff's First Amended Complaint

Plaintiff's first amended complaint documents in detail Plaintiff's request for mental health treatment. It was not until Plaintiff is placed in KVSP's mental care crisis bed that he received any such treatment. His requests are often thwarted by transfers and other administrative issues. Moreover, some of the requested treatment doesn't appear available at the various institutions, even though some prison staff told him it was.

The Court finds that Plaintiff's allegations do not set forth a constitutional claim for Cruel and Unusual Punishment under the Eighth Amendment for a few reasons. Plaintiff does not allege that any specific defendant knew that he required a certain treatment and then purposefully refused to provide it. Instead, Plaintiff alleges that he repeatedly asserted that he needed care. He also alleges that various staff told him he would be screened for a higher level of care. But at no time does he allege that a medical professional said he needed a certain type of mental health care, or that he suffered from a certain type of mental health need, and then purposefully failed to provide care. Indeed, Plaintiff alleges that he was told that professionals

11

disagreed with him about his need for care. He also alleges that he did eventually receive some treatment through being in a crisis bed.

Moreover, Plaintiff's mental condition as described does not rise to the level of serious medical need for purposes of the Eighth Amendment's cruel and unusual punishment clause. Plaintiff has not been diagnosed with any specific mental health condition by a medical professional. Similarly, Plaintiff was not prescribed a certain treatment or medication that was needed to treat a specific mental health condition. Plaintiff described how he was under "mental strain and anguish," was suffering from general mental strain after experiencing serious traumatic injury, felt "hopeless, depressed, unfocused and lost faith in mental health care services." He also describes how he acted aggressively toward another inmate because "he could not focus nor function properly." These allegations fall short of indicating a medical condition in need of specific treatment. Rather, Plaintiff describes being depressed about his prison life and exposure to prison violence, at least some of resulted from his own actions attacking other inmates. To state a violation of constitutional law, Plaintiff's medical condition must rise above the mental challenges inherent in prison life.

Furthermore, Plaintiff alleges repeated disagreements with his mental health professionals regarding his level of care. If true, such allegations would indicate that mental health professionals could have been negligent in providing him additional attention. But that does not establish that they violated the U.S. Constitution and subjected him to cruel and unusual punishment.

## VI. EVALUATION OF PLAINTIFF'S EIGHTH AMENDMENT CLAIM FOR EXCESSIVE FORCE

### A. Legal Standards

"In its prohibition of 'cruel and unusual punishments,' the Eighth Amendment places restraints on prison officials, who may not… use excessive physical force against prisoners." Farmer v. Brennan, 511 U.S. 825, 832, 114 S. Ct. 1970, 1976, 128 L. Ed. 2d 811 (1994) (citing Hudson v. McMillian, 503 U.S. 1 (1992)). "[W]henever prison officials stand accused of using excessive physical force in violation of the [Eighth Amendment], the core judicial inquiry is…

whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Hudson, 503 U.S. at 6-7 (citing Whitley v. Albers, 475 U.S. 312 (1986)).

When determining whether the force was excessive, the court looks to the "extent of the injury suffered by an inmate…, the need for application of force, the relationship between that need and the amount of force used, the threat 'reasonably perceived by the responsible officials,' and 'any efforts made to temper the severity of a forceful response.' " Hudson, 503 U.S. at 7 (quoting Whitley, 475 U.S. at 321). While *de minimis* uses of physical force generally do not implicate the Eighth Amendment, significant injury need not be evident in the context of an excessive force claim, because "[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated." Hudson, 503 U.S. at 9 (citing Whitley, 475 U.S. at 327).

### B. Evaluation of Plaintiff's First Amended Complaint

Plaintiff describes being forcibly extracted from his cell in order to get on the transfer bus to KVSP, including being exposed to tear gas and pepper spray. Plaintiff describes a large amount of force being used. The question is whether the force was done do maliciously and sadistically harm Plaintiff, or to maintain and restore discipline.

As stated in the Court's first screening order, Plaintiff's allegations demonstrate that the force was used for the purpose of extracting Plaintiff from his cell, and not in a malicious and sadistic way with the purpose to cause pain to Plaintiff. Plaintiff alleges he refused to exit his cell in order to transfer. He alleges that a correctional sergeant asked "Are you gonna pack your property and get on the bus?" Plaintiff responded "by informing the correctional sergeant that he was not going to do anything until he spoke with his mental health clinician." The correctional sergeant then locked Plaintiff's tray slot door and turned off the water to the sink and toilet in the call. A couple of hours passed with that approach to extracting Plaintiff. The correctional lieutenant ordered Plaintiff to be handcuffed, and Plaintiff responded that he was not going to do so. The correctional lieutenant then brought a cart containing tear gas, helmets, shields and other equipment and put it in front of Plaintiff's call. Prison staff left those items in

front of Plaintiff for "awhile." A captain asked again if Plaintiff would get on the bus. Plaintiff and correctional staff discussed the situation more, with correctional staff warning that they would forcibly extract Plaintiff and Plaintiff refusing to leave the cell. It was only after these repeated warnings and less forcible attempts that prison officials eventually used tear gas and pepper spray to extract Plaintiff from his cell.

Based on these facts, although the amount of force was high, it was not done for sadistic and malicious reasons in violation of Plaintiff's Eighth Amendment rights. Prison staff also made attempts to temper the use of force and proceeded slowly in their elevation of force. Furthermore, no force was used after extracting Plaintiff from his cell. It thus appears that, even if the allegations are true, officers used force in order to extract Plaintiff from his cell and not to sadistically cause him pain. Note this constitutional claim does not turn on whether the transfer was in fact appropriate or not. The correctional officers were under orders to transfer Plaintiff to another institution and used force to carry out that direction, rather than to hurt Plaintiff. To use force to enforce prison orders is not cruel and unusual punishment under the Eighth Amendment based on the legal standards described above.

## VII. CONCLUSION AND RECOMMENDATIONS

For the foregoing reasons, IT IS HEREBY RECOMMENDED that

1. The following claims and Defendants be dismissed from this action:
    a. Plaintiff's Eighth Amendment claims for deliberate indifference to serious medical needs and excessive force; and
    b. Defendants R.M. Hutchinson, J. Lewis and J. Gallagher.

If these recommendations are adopted in full, this action will proceed only against J. Torres, M. Hoggard, and J. Acebedo for failure to protect in violation of the Eighth Amendment.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l). Within fourteen (14) days after being served with these findings and recommendations, any party may file

14

written objections with the court. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within seven (7) days after service of the objections. The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal. <u>Wilkerson v. Wheeler</u>, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing <u>Baxter v. Sullivan</u>, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated: **December 26, 2017**                /s/ Erica P. Grosjean
                                              UNITED STATES MAGISTRATE JUDGE